AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of )
)
A Silver Apple MacBook Bearing Serial No. )
W803112RAGZ (DEA Exhibit N-4) in the )    Case No. 2:20-MJ-00871
Custody of the United States Drug )
Enforcement Administration, Seized on )
December 5, 2019 )
)
)

described further in Attachment A

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| *See Attachment B* | *See Attachment B* |

The application is based on these facts:

> *See attached Affidavit*
> ☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Marlon Coronado, TFO, DEA
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, California

_____
*Printed name and title*

AUSA: Solomon Kim – Ext. 2450

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), seized on December 5, 2019 and currently maintained in the custody of the Drug Enforcement Administration in Los Angeles, CA:

1.   A silver Apple MacBook bearing serial no. W803112RAGZ (DEA Exhibit N-4).

2.   A black Apple iPhone with a dark brown colored case (DEA Exhibit N-5) in SSEE #S0001256845.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

    1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), namely:

        a.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

        b.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

        c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

      d.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

      e.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

      f.   Contents of any calendar or date book;

      g.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

      h.   Travel records, including reservation numbers, flight check-ins, and baggage check-ins.

      i.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      j.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

         i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.     records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

iii

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR THE SUBJECT DEVICES

3.    In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the

iv

scope of the items to be seized.  The search team may also
search for and attempt to recover deleted, "hidden," or
encrypted data to determine, pursuant to the search protocols,
whether the data falls within the scope of the items to be
seized.

      ii.  The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

      iii. The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

      e.   If the search team, while searching a SUBJECT
DEVICE, encounters immediately apparent contraband or other
evidence of a crime outside the scope of the items to be seized,
the team shall immediately discontinue its search of that
SUBJECT DEVICE pending further order of the Court and shall make
and retain notes detailing how the contraband or other evidence
of a crime was encountered, including how it was immediately
apparent contraband or evidence of a crime.

      f.   If the search determines that a SUBJECT DEVICE
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the SUBJECT DEVICE and delete or destroy all forensic copies
thereof.

      g.   If the search determines that a SUBJECT DEVICE
does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

        h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

        i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

        j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

       4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

5.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Marlon Coronado, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of an application for a warrant to search two digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Drug Enforcement Administration ("DEA"), in Los Angeles, California, as described more fully in Attachment A.

2. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.     I have been a Los Angeles Airport Police Department ("LAXPD") Officer since June 2004.  I have been assigned to the DEA as a sworn Task Force Officer ("TFO") since July 2015.  I am currently assigned to the DEA Los Angeles Field Division, Los Angeles International Airport Narcotics Task Force ("LAXNTF").

5.     The LAXNTF is an inter-agency task force based at the Los Angeles International Airport ("LAX").  In addition to the DEA, the LAXNTF consists of the following agencies: the Los Angeles World Airports Police Department, the Los Angeles Police Department, and the Los Angeles County Sheriff's Department. The LAXNTF also works closely with the United States Customs and Border Protection, the Transportation Security Administration ("TSA"), the Department of Homeland Security, and the Federal Bureau of Investigation.  All of the aforementioned agencies recognize the need for a coordinated law enforcement effort to target airport/airline internal criminal enterprises that use the aviation system to transport large amounts of illicit drugs throughout the United States, and throughout the world.

6.     Specifically, the LAXNTF is focused on investigating airport/airline internal conspiracies in which criminal enterprises recruit airport/airline employees to exploit their privileged airport access and knowledge of existing airport security procedures, as well as airline passengers smuggling drugs and drug proceeds through the airport.  Previous and current investigations have identified Transnational Criminal Organizations ("TCOs") that rely generally on drug trafficking

as their primary source of revenue.  As such, TCOs require the use of various forms of transport in order to obtain and distribute large amounts of illicit drugs into and through the United States, and air travel provides a significant opportunity for them to do so.  Additionally, air travel provides an opportunity to smuggle and distribute other contraband, including drug proceeds.

7.    During my career, I have participated in a variety of drug investigations ranging from simple possession to complex international conspiracies.  I have also participated in the execution of search warrants, conducted physical surveillances, reviewed video surveillance, spoken to confidential informants, interviewed suspects, and discussed drug investigations with other experienced drug investigators concerning the methods and practices utilized by drug traffickers.

8.    From June 2014 through June 2015, I was assigned to Homeland Security Investigations ("HSI") as a TFO.  While assigned to HSI, I participated in several drug investigations, involving the unlawful importation, exportation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, and the conducting of monetary transactions involving the proceeds of specified unlawful activities.

9.    Based on my training and experience, I am familiar with the methods of operation of narcotics traffickers, including the importation, exportation, distribution, transportation, and storage of controlled substances, as well as

the collection of money proceeds of drug trafficking and methods
of money laundering used to conceal the nature of the proceeds.
I am also familiar with the methods of operation used by people
who distribute controlled substances, including the
distribution, storage and transportation of controlled
substances, as well as the collection of proceeds of drug
trafficking and methods of money laundering used to conceal the
nature of the proceeds.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

10.  On December 20, 2019, a federal grand jury indicted
MCGHEE for possession with intent to distribute cocaine in
<u>United States v. Darren Fitzgerald McGhee</u>, CR No. 19-00787-CJC.
The Indictment is incorporated by reference herein.

11.  Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

### A.    **TSA Agents Discovered Drugs in MCGHEE's Checked Bag**

12.  On or about the late evening of November 27, 2019, TSA
Officer Ricardo Lopez was assigned to conduct security
screenings of checked luggage in the LAX Terminal 7 baggage
screening room.  A screening machine identified a suspicious
bulk mass inside of a checked suitcase.

13.  TSA Officer Lopez removed the suitcase, a black
Samsonite soft-sided suitcase, from the screening machine and
opened it to search for any hazardous materials.  TSA Officer
Lopez discovered six tightly wrapped kilogram-sized packages and
various brochures inside the suitcase.  Suspecting that the

packages contained narcotics, TSA Officer Lopez notified TSA Supervisor Esomchi Nze of the items.  TSA Supervisor Nze subsequently notified TSA Transportation Security Specialist Explosives ("TSSE") James Becker.  TSSE Becker arrived on scene and advised the packages appeared to be narcotics and that the LAXPD should be notified.  Upon arrival, LAXPD Officers Monica Urbieta and Aroon Temsuk came to the same conclusion that the packages appeared to be narcotics.  At that point, at approximately 12:30 a.m. on November 28, 2019, DEA LAXNTF Special Agent Norm Tobias and I (TFO Marlon Coronado) were notified of the suspected narcotics in the LAX Terminal 7 baggage screening room.

14.  Prior to our arrival on scene, the LAXPD officers had identified the baggage tag (#6016288057) on the suitcase, which had MCGHEE's name on it and his flight number, UA1165.  LAXPD Officers Urbieta and Temsuk went to Terminal 7 and spoke with United Airlines ("UA") Representative Jorge Barahona.  Mr. Barahona informed the Officers that UA1165 had already departed with MCGHEE on board.

15. Based on my knowledge of and experience with UA's standard practices at LAX, the passenger whose name is on the plane ticket and baggage tag must be physically present to provide a UA representative his or her valid photo identification.  The UA representative then verifies the passenger's name and the date of birth on the reservation before allowing that passenger to check a bag or suitcase.  That passenger's name (and not someone else's) is then printed on the

tag, which is then immediately affixed to the bag or suitcase. UA then typically takes custody of the bags or suitcases from the passenger, thus making it highly unlikely that someone else removed the tag from the checked suitcase and placed it on a different suitcase.  This leads me to believe that MCGHEE personally checked his black Samsonite suitcase with a UA representative upon arriving at the airport.

**B.    The Kilogram-Sized Bricks in MCGHEE's Suitcase Tested Positive for Cocaine Hydrochloride**

16. Special Agent Tobias and I arrived on scene at approximately 1:20 a.m. and secured MCGHEE's suitcase and its contents.  SA Tobias and I then transported the suitcase and suspected narcotics to the DEA LAXNTF office where we began processing them as evidence.  SA Tobias donned his personal protection equipment and began testing each package with a TruNarc Raman spectrometer used for the rapid identification of suspected narcotics.  All six packages tested positive for Cocaine Hydrochloride for a gross weight of 7.18 kilograms.

**C.    MCGHEE Contacted at Newark Liberty International Airport**

17. When UA1165 landed at EWR, personnel from the Port Authority of New York & New Jersey Police Department made contact with MCGHEE.  Upon request, MCGHEE provided his New Jersey driver license, which he used to identify himself at LAX. MCGHEE also stated he had checked in one bag on this flight and that he had packed it himself.  MCGHEE was not taken into custody and was allowed to continue with his travel.

18.   On December 4, 2019, DEA/LAX Group 3 Special Agent Norm Tobias obtained an arrest warrant and criminal complaint charging MCGHEE with possession with the intent to distribute cocaine in the Central District of California.

**D.   Arrest of MCGHEE by Newark Field Office DEA members**

19.   On December 5, 2019, Newark Field Office DEA members established surveillance on MCGHEE in Newark, New Jersey at the New Hope Daycare Center, where MCGHEE was believed to be employed.  MCGHEE was ultimately arrested.  TFO Collazo witnessed Special Agent Michael Lieblich search MCGHEE and discover an Apple iPhone and an Apple MacBook in a laptop sleeve of a black backpack, both on MCGHEE's person.  The Apple iPhone was determined to be a black iPhone with a dark brown colored case.  The Apple MacBook was determined to be a MacBook bearing serial no. W803112RAGZ.

**IV. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>**

20.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

      f.   Airport drug traffickers usually work with a coordinator with whom they communicate by phone through text messages, emails, and other mobile communication applications, such as WhatsApp, regarding flight arrangements and logistical details concerning the transportation of drugs.  These drug traffickers also check in for flights on their laptops or phones.

## V.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

21.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

23.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

in a short period of time for a number of reasons, including the following:

      a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

24.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

## VI. <u>CONCLUSION</u>

25.   For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A

_____

MARLON CORONADO, Task Force
Officer, DEA

Subscribed to and sworn before me
this _____ day of FEBRUARY, 2020.

_____

UNITED STATES MAGISTRATE JUDGE